UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Christopher Ostroushko, *et al.*

Defendants.

Court File No. 26-cr-86 (NEB/JFD)

**DEFENDANTS' MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION**

## INTRODUCTION

The indictment in this case stems from an incident involving right wing provocateur and "content creator" Savanah Hernandez. The indictment alleges Defendants assaulted Hernandez during an anti-ICE protest at the Whipple building on April 11, 2026. Hernandez works for right-wing advocacy group Turning Point USA, and she attended the protest as part of her work for Turning Point.

Turning Point and the Trump administration have an unprecedented symbiotic political and media relationship. Turning Point has access to the most senior members of the Trump administration, the Department of Justice, and the FBI, and influences policymaking in the administration. In exchange for this influence, Turning Point coordinates political communication with the administration, amplifies the administration's most extreme messaging, and offers the administration media and organizing support, often functioning as a propaganda arm of the administration. Its

political and financial support was also critical in getting Trump elected President in 2024. Thus, it is not surprising that when Hernandez showed up at a Whipple Building protest to stir up trouble, and a scuffle with Defendants ensued, that senior Trump officials, including Vice President Vance, immediately spoke out publicly about the administration's intent to prosecute Defendants.

Defendants move to dismiss the indictment on the basis that their prosecution is both selective and vindictive. Further, Defendants request discovery and an evidentiary hearing on their claims for unconstitutional prosecution. In order to obtain discovery on these claims, Defendants need only show "some evidence" of selective or vindictive prosecution. Further, given that this "some evidence" standard is calibrated against the presumption of regularity, which the Trump administration has squandered, Defendants arguably need not even meet that "some evidence" standard to obtain discovery. Regardless, ample evidence described herein shows that DOJ and the Trump administration prosecuted Defendants based on their political opposition to the administration's immigration policies, and to cultivate Turning Point's continued support. At minimum, Defendants have satisfied the "some evidence" showing needed to obtain discovery and an evidentiary hearing on their selective and vindictive prosecution claims, and the Court should grant their motion.

## BACKGROUND

### I. TURNING POINT AND THE TRUMP ADMINISTRATION HAVE A LONGSTANDING SYMBIOTIC RELATIONSHIP.

The alleged victim in this case, Savanah Hernandez, is a right-provocateur and troll. She is a content creator for right-wing organizing and advocacy group Turning Point USA's media operation. Hernandez cut her teeth as a producer and on-air personality at Alex Jones' "Infowars" program. She left the program after it imploded due to Jones's grotesque lies about the Sandy Hook school shooting, ultimately landing at Turning Point.[1]

According to the Columbia Journalism Review:

> During Trump's second term, Hernandez has been among a set of content creators whom the White House has recruited to form an alternative, MAGA-friendly press pool. Many of those content creators were at the White House in early October for a roundtable on the alleged dangers of antifa, where their policy recommendations were fielded and eventually carried through.
>
> . . . .
>
> Hernandez identifies as a "Trump supporter, absolutely." She positions herself as a bulwark ensuring Trump sticks to his most radical policy promises.[2]

The Trump administration's close relationship with Turning Point is well-documented and stretches back to President Trump's first term.[4] For example, in 2019, Turning Point launched the "Culture War College Tour," a lecture circuit on college

---

[1] *E.g.*, https://www.wral.com/archive/18434237/

[2] https://www.cjr.org/feature/savannah-hernandez-turning-point-usa-canal-street-ice-raid-law-and-order-influencer.php

[4] *How Turning Point, once spurned by the RNC, is becoming Trump's 'force multiplier' in battleground states*, POLITICO (June 15, 2024 6:00 AM), https://www.politico.com/news/2024/06/15/turning-point-trump-battleground-states-00163563; *How Charlie Kirk and Turning Point USA helped Trump and MAGA win,* AL JAZEERA (Sept. 11, 2025), https://www.aljazeera.com/news/2025/9/11/how-charlie-kirk-and-turning-point-usa-helped-trump-and-maga-win.

campuses which featured President Trump's sons Donald Trump Jr. and Eric Trump, as well as Eric's wife Lara Trump.[5]

Turning Point functioned as a "force multiplier" for Trump in the 2024 election, cultivating and organizing political events for the Trump campaign, which "armed Trump's presidential campaign . . . with a powerful operational ally."[6] Among other assistance, Turning Point "pour[ed] tens of millions of dollars into an ambitious get-out-the-vote operation in three battleground states . . . ."[7]

The close relationship continues to this day. Senior administration officials, including President Trump, routinely speak at Turning Point public events.[8] On October 15, 2025, President Trump posthumously awarded Charlie Kirk the Presidential Medal of Freedom.

Per National Public Radio:

> At the time of his death, [Turning Point founder Charlie] Kirk was seen as one of the most influential voices within the conservative youth space and broader Republican Party. Supporters have credited him for the gains that then-candidate Donald Trump made with young voters in the 2024 presidential election, a crucial bloc that helped propel him to a second term.
>
> Kirk's influence extended into Trump's second administration, as Kirk maintained close relationships with top White House officials while

---

[5] https://www.influencewatch.org/non-profit/turning-point-usa/
[6] https://www.politico.com/news/2024/06/15/turning-point-trump-battleground-states-00163563
[7] *Id.*
[8] *E.g.*¸ https://www.pbs.org/newshour/politics/watch-live-trump-speaks-at-turning-point-action-event-in-arizona; https://www.axios.com/2025/09/30/vance-trump-jr-charlie-kirk-turning-point ("Vice President Vance and Donald Trump Jr. are planning to bolster Turning Point USA — the conservative group co-founded by the late Charlie Kirk — by appearing at its events in the coming months, Axios has learned.")

> continuing to engage with the Make America Great Again movement's newly expanded youth coalition.
>
> For his followers, his influence meant their views had a direct pipeline to the president. For the administration, he was a trusted messenger on policy decisions, even when they split the MAGA base, as with the strikes on Iranian nuclear facilities in the summer of 2025.[9]

In September 2025, the Department of Education announced it was partnering with Turning Point to develop "educational materials" for K-12 schools.[10] In November 2025, Erika Kirk announced that Turning Point would support Vice President Vance's 2028 presidential run and work to get him elected.[11] In February 2026, President Trump invited Turning Point CEO Erika Kirk to attend his State of the Union Speech as his special guest.[12] In March, he named her to the Air Force Academy's "Board of Visitors."[13]

In sum, Turning Point and the Trump administration have a symbiotic relationship in which the administration boosts Turning Point's profile and delivers various government plums to the organization, while Turning Point rallies young conservatives to support the administration's policies and political campaigns.

---

[9] https://www.nprillinois.org/2026-09-10/one-year-after-charlie-kirks-death-turning-point-usa-faces-an-uncertain-future

[10] https://www.edweek.org/policy-politics/how-charlie-kirks-turning-point-usa-is-expanding-its-reach-to-k-12-schools/2025/09

[11] https://krcrtv.com/news/nation-world/turning-point-usa-plans-to-support-vance-for-president-in-2028-according-to-erika-kirk-marco-rubio-charlie-kirk-utah-valley-university

[12] https://www.fox29.com/news/state-union-guests-trump-invites-erika-kirk-parents-slain -national-guard-member

[13] https://www.foxnews.com/politics/trump-appoints-charlie-kirks-widow-erika-air-force-academy-board-visitors

This close relationship has influenced federal policy. In the wake of Charlie Kirk's assassination, President Trump issued National Security Presidential Memorandum 7 ("NSPM-7"), "Countering Domestic Terrorism and Organized Political Violence."[14] NSPM-7 is a blueprint for prosecution and harassment of those who protest ICE abuses or otherwise oppose this administration. It cites Kirk's murder and references protests of ICE activity in Portland and Los Angeles (labeling them "riots"). It describes these protests as "a culmination of sophisticated, organized campaigns of targeted intimidation, radicalization, threats, and violence designed to silence opposing speech, limit political activity, change or direct policy outcomes, and prevent the functioning of a democratic society." *Id*.

The Brennan Center summarizes NSPM-7:

> NSPM-7 lists disparate incidents, lumping together the assassination of right-wing activist Charlie Kirk with First Amendment–protected activity, such as criminal justice protests, as supposed proof of an organized campaign of left-wing violence aiming to "change or direct policy outcomes." It instructs federal law enforcement and other agencies to investigate and prosecute individuals and groups involved in this campaign, as well as their supporters, pointing agencies to a swath of what it identifies as antifascist ideologies, including "anti-Americanism, anti-capitalism, and anti-Christianity; support for the overthrow of the United States Government; extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality."[15]

---

[14] NAT'L SECURITY PRESIDENTIAL MEMORANDUM/NSPM-7, COUNTERING DOMESTIC TERRORISM AND ORGANIZED POLITICAL VIOLENCE (2025) (situating NPSM-7 as a response to anti-ICE protests in Los Angeles and Portland).

[15] https://www.brennancenter.org/our-work/analysis-opinion/how-administration-picks-its-targets-then-picks-crime

The Trump administration used Kirk's murder as a public springboard to launch NSPM-7 and its efforts to persecute so-called "leftists." Less than 24 hours after Kirk's murder, White House Deputy Chief of Staff Stephen Miller tweeted: "There is an ideology that has steadily been growing in this country, which hates everything that is good, righteous and beautiful and celebrates everything that is warped, twisted and depraved. . . . The fate of millions depends on the defeat of this wicked ideology."[16] Three days later, Miller stated: "The last message that Charlie Kirk gave to me before he joined his creator in heaven was, he said, that we have to dismantle and take on the radical left organizations in this country that are fomenting violence. And we are going to do that."[17]

More recently, Miller stated:

> The leftist is fundamentally motivated by envy, by hatred, by jealousy. The leftist looks at what is beautiful and what is good and what is natural and is filled with envy and hatred. The leftist looks at a perfect family with a perfect life and a perfect job and perfect kids that goes to church every Sunday and is filled with a feeling of inadequacy and jealousy, and they covet. And they turn those emotions ultimately into a desire to subjugate, to oppress, and to inflict pain and suffering.
>
> It's not a coincidence that when you look at these violent antifa demonstrations and you see any photograph of those who were assembled – to be blunt, not one of the people that is demonstrating looks like a normal person. Not one looks normal. They're all deformed in some way – in their appearance, in their dress, in their mannerism. . . . Every one of them, through the course of their life and their decisions, has scarred their body and their appearance in many different ways, to the point in which their outer appearance becomes a manifestation of their inner hatred.

---

[16] https://x.com/StephenM/status/1966140301044564370; https://www.washingtonpost.com/politics/2025/09/11/trump-kirk-consequences-gop-conservative/

[17] https://www.nytimes.com/2026/09/22/us/charlie-kirk-trump-free-speech.html?eafs_enabled=false

Ex. 28 at 13.

As discussed below, the public and politicized nature of Defendants' indictment for allegedly assaulting Ms. Hernandez fits squarely within the symbiotic relationship between the Trump administration and Turning Point, and the administration's virulent rhetoric against "leftists." The numerous public statements by senior Trump officials about the incident and the charges against the Ostroushkos is just more evidence of the close relationship between Turning Point and President Trump and evinces an impermissible discriminatory motive behind Defendants' prosecution.

## II. SENIOR TRUMP OFFICIALS ANNOUNCED THEIR INTENT TO PROSECUTE DEFENDANTS ALMOST IMMEDIATELY AFTER THE INCIDENT.

On April 11, while attending an anti-ICE protest at the Whipple Building, Hernandez and the Ostroushkos were involved in a scuffle that included Hernandez striking Paige Ostroushko in the face and Christopher Ostroushko shoving Hernandez in the back. Defendants strongly dispute that their conduct was in any way criminal, let alone grounds for a federal indictment. Regardless, the merits of Hernandez's allegations are not material for determining this motion. Rather, the circumstances of the investigation and charging of Defendants are what is relevant here and, as discussed below, they clearly show the discriminatory and vindictive animus behind the indictment.

Hernandez flooded the internet with public statements about the incident immediately after it occurred. She tweeted about the alleged assault 38 times on April 11, drawing the attention of numerous right-wing influencers who retweeted and amplified these postings and forwarded the tweets to numerous senior Trump administration officials.

Within hours, Assistant Attorney General for Civil Rights Harmeet Dhillon tweeted to Hernandez that Dhillon was "on it" with respect to investigating and prosecuting the incident. Hernandez responded: "Please help me Harmeet and ensure that justice is served here."[22]

On April 12, 2026, Hernandez continued her stream of tweets about the incident, posting fifteen more times. Attorney Mike Davis, a former Trump advisor,[23] tweeted that he was pushing the administration to bring federal charges against the Ostroushkos, writing: "Thank you, @FBIDirectorKash, for opening a federal criminal investigation. I just spoke with @Savsays. She is very grateful."[24] Hernandez responded to this tweet: "Thank you Mike for elevating this to the highest levels of the government."[25]

On April 13, 2026, Hernandez appeared for an interview on Fox News' Laura Ingraham show. Among other things, Hernandez stated: "I know the left wing is violent. They assassinated Charlie Kirk last year and now they're coming for every single Turning Point USA employee because they know they can get away with it because they know the local jurisdictions are not going to charge them."[26] Hernandez further stated: "This has been elevated to both the DOJ and the DHS. They are opening an investigation as well." She described the incident as a "brutal assault," complaining, "how is this allowed to happen in Trump's America?"

---

[22] https://x.com/Savsays/status/2043364785933230125
[23] https://www.politico.com/news/magazine/2024/09/20/mike-davis-trump-potential-attorney-general-profile-00179358
[24] https://x.com/mrddmia/status/2043385069038100684
[25] https://x.com/Savsays/status/2043392312676397294
[26] https://x.com/nicksortor/status/2043836784207974677

DHS "Border Czar" Tom Homan joined the conversation with Ingraham and Hernandez. He added, "you know what feeds all this? Mayors and governors and members of Congress who want to vilify Republicans, they want to vilify President Trump, they want to vilify Turning Point USA because they have conservative beliefs. . . . I'm grateful the FBI is stepping in, the DOJ is going to seek prosecution on this, because at this point I don't trust any local jury in a sanctuary jurisdiction."[27]

Ingraham asked, "Savanah- are you satisfied that the FBI is going to handle this?" Hernandez replied, "I hope they do, and again, DHS is involved as well, and I hope that the full force of the federal government is utilized against these people to send a message to all of the radical left who have been targeting journalists for years. . . . I really hope that a message was sent." The next morning, the Fox News morning show reported: "the Assistant Attorney General Harmeet Dhillon is going to look into this, the FBI is investigating this."[28]

On April 14, Vice President J.D. Vance spoke at a Turning Point even in Athens, Georgia. He stated to the assembled crowd:

> I talked to Kash Patel on the way down here and I said I assume we are doing something here and he said yes we have multiple agents on the ground and we've already talked to Savanah we're going to use the video to go after the people who assaulted her and then try to defund the networks that funds those radicals that go around assaulting activists.[31]

---

[27] https://www.youtube.com/watch?v=AB63tN8FcbI
[28] https://www.youtube.com/watch?v=AB63tN8FcbI
[31] *Vance vows to go after radical activists after reporter assault*, FOX NEWS (April 15, 2026), https://www.foxnews.com/video/6393168539112.

That same day Hernandez posted a video of Vance's speech, and thanked him and the administration's response to her alleged assault:



Savanah Hernandez @Savsays · Apr 14
Thank you to Vice President @JDVance for highlighting the attack I endured in Minneapolis.

Not only has the response from this administration been quick, but this is the first time I've experienced the federal government actually utilize multiple agencies to hold these violent leftists responsible.

Previously, attacks on journalists like myself would be completely ignored, but this administration immediately followed up with me and opened an investigation.

I'm extremely grateful and am looking forward to seeing the full force of the law utilized against these violent leftwing activists.

Not only for me, but for all of my friends who have been assaulted before:



238 2.2K 13K 95K

Also on April 14, Assistant Attorney General Dhillon appeared on Newsmax to discuss Hernandez's allegations against the Ostroushkos. Dhillon stated: "I've been in touch with her team and you know we have an open investigation so I can't get into any details, but my office is actively involved in investigating what happened and seeing whether there are federal charges that can be brought."[32]

[32] https://x.com/AAGDhillon/status/2044018262812303729

On April 17, President Trump delivered the keynote speech at Turning Point rally in Arizona.[33] On April 24, 2026, Turning Point organized a "listening session" between disgruntled MAGA activists and senior Trump administration officials, including HHS Secretary Robert Kennedy, Jr., and President Trump himself.[34] Politico described this meeting as "one of the first and most prominent examples of [new Turning Point CEO Erika Kirk] helping the Trump administration keep its coalition together ahead of what is expected to be a difficult midterm election cycle."[35] Also on April 24, 2026, Hernandez and Assistant Attorney General Dhillon participated in interviews on Turning Point's podcast "The Charlie Kirk Show". Dhillon stated, "we do have lawyers on the ground . . . we interviewed and preserved Savanah's input early on in this case."[36]

Four days later, the government secured an indictment of Christopher Ostroushko and Paige Ostroushko on one felony count of Interference with Federally Protected Activity (18 U.S.C. § 245(b)(1)(B)) and one count of misdemeanor assault under 18 U.S.C. § 113. Deyanna Ostroushko was indicted on one count of misdemeanor assault. ECF 1.

On April 29, 2026, FBI Director Kash Patel tweeted:

> Confirming: Today, three individuals have been indicted on charges of assaulting TPUSA reporter Savanah Hernandez. When recent video of individuals assaulting Savanah surfaced out of St. Paul, Minnesota, this FBI

---

[33] *See A recap of Trump's appearance at the Turning Point Action event in Arizona*, NATIONAL PUBLIC RADIO (Apr. 18, 2026 7:42 AM), https://www.npr.org/2026/04/18/nx-s1-5786675/a-recap-of-trumps-appearance-at-the-turning-point-action-event-in-arizona (describing President Trump's close alignment with Turning Point).

[34] https://www.politico.com/news/2026/04/24/erika-kirk-helped-bring-maha-trumps-white-house-after-pesticide-dustup-00889635

[35] *Id.*

[36] https://podcasts.apple.com/tr/podcast/dismantling-the-antifa-ngo-alliance-ama-263/id1460600818?i=1000763482348&l=tr

> immediately engaged and led the investigation - this week landing federal charges supported by our great partners at @TheJusticeDept led by Acting AG @DAGToddBlanche.
>
> Above all, we are thankful @Savsays is ok. Let this be a message to others who may try something similar – this FBI will find you. @FBIMinneapolis.[37]

Hernandez responded to Patel:

> Thank you Kash!! Very appreciative to this FBI for handling this so quickly and effectively. Both myself and many of my friends have been attacked and usually there is ZERO response from the state or federal government so this is extremely appreciated. Thank you.[38]

Also on April 29, Attorney General Todd Blanche tweeted:

> Today, Christopher, Deyanna, and Paige Ostrouchko were indicted by a grand jury for allegedly assaulting journalist and Turning Point USA contributor Savannah Hernandez, while she was lawfully reporting on anti-ICE protests outside a federal building in St. Paul. . . . These deplorable actions as charged in the indictment will not be tolerated in America, and this Department of Justice will always punish unhinged acts of political violence."[39]

Hernandez responded to Blanche: "Thank you so much for your swift action in this case. I truly cannot express how grateful I am, not only behalf of myself, but also every single American this sets precedent for."[40]

On April 29, 2026, Hennepin County prosecutors charged Mr. Ostroushko with misdemeanor fifth-degree assault related to the events of April 11, 2026, but declined to charge Paige or Deyanna Ostroushko because "insufficient evidence" existed to support

[37] https://x.com/FBIDirectorKash/status/2049587089331618006?lang=en.
[38] *Id*.
[39] https://x.com/AGToddBlanche/status/2049578866176393378
[40] https://x.com/Savsays/status/2049584893143753048

criminal charges against them.[41] Mr. Ostroushko's state charges were later dismissed.[42] On May 5, 2026, Hernandez filed sued the Ostroushkos for assault and battery, seeking damages in excess of $75,000, plus punitive damages. *See* Complaint, ECF 1, Case No. 26-cv-2517 (JMB/DLM) (D. Minn., filed May 5, 2026).

Thus, in a case meriting only one misdemeanor assault charge at the state level – for an alleged shove at a protest – the most senior officials in the Trump administration, including the Attorney General, the Assistant Attorney General for Civil Rights, DHS' "Border Czar," the FBI Director, and the Vice President, all publicly announced the government's intent to prosecute Defendants. The government secured an indictment at light speed, and then these same senior officials trumpeted the indictment publicly. Sadly, as discussed below, DOJ's nakedly political prosecution of the Ostroushkos is only one of many such prosecutions that has been initiated by the second Trump administration.

## III. THE TRUMP ADMINISTRATION HAS INITIATED POLITICAL PROSECUTIONS IN THIS DISTRICT AND ELSEWHERE.

DOJ has operationalized NSPM-7 to initiate numerous political prosecutions.[43] For example, in a meeting of U.S. Attorneys and their criminal division chiefs in January 2026, after the mass resignation of AUSAs in this District, Assistant Attorney General Aakash Singh warned those gathered that President Donald Trump is their "chief client" and anyone uncomfortable with advancing his administration's directives must step aside.

---

[41] https://www.hennepinattorney.org/news/news/2026/April/ostroushko-charges.

[42] https://www.cbsnews.com/minnesota/news/christopher-ostroushko-state-charges-dismissed/

[43] https://chicago.suntimes.com/immigration/2026/06/08/aakash-singh-justice-department-blanche-boutros-trump-broadview-chicago

According to Bloomberg News: "Participants were taken aback by Singh's comments, which some interpreted as a clear reference to the Minneapolis prosecutors resigning that week after DOJ's orders to investigate protesters and state Democrats. Singh had closely coordinated those efforts, said two people with knowledge of his role."[44]

Singh has directed U.S. Attorneys' offices to initiate political prosecutions in other districts. He directed prosecutors to investigate and pursue charges against George Soros and his Open Society Foundation.[45] And he pushed the recently announced indictment of the Southern Poverty Law Center in Alabama. The House Judiciary Committee has begun an investigation into that case after receiving "whistleblower reports that [Singh] ordered the U.S. Attorney's Office for the Middle District of Alabama to rush through the indictment of the SPLC despite serious concerns about the strength of the case."[46] Notably, this political prosecution of SPLC appears tied to Turning Point's repeated complaints about the organization to the Trump administration and Congressional Republicans.[47]

Singh has also directed at least one U.S. Attorney's office to employ a corrupt grand jury process: "As multiple grand juries refused to indict Washingtonians on federal charges

---

44 https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump

45 https://www.nytimes.com/2025/09/25/us/politics/justice-trump-george-soros-foundation.html

46 https://democrats-judiciary.house.gov/media-center/press-releases/ranking-members-raskin-scanlon-launch-inquiry-into-trump-doj-s-abusive-and-baseless-prosecution-of-southern-poverty-law-center

47 https://www.nytimes.com/2026/06/23/us/fbi-southern-poverty-law-center-letter.html; https://www.npr.org/2026/04/21/g-s1-118275/southern-poverty-law-center-fraud-charges-paid-informants

following mass street arrests, Singh instructed the office's criminal team to ask the chief judge to dismiss jurors who presented hurdles and then 'rinse and repeat' to a new panel."[48]

In May 2026, a federal court dismissed an indictment on the basis of vindictive prosecution because of interference from Singh and then-Deputy Attorney General Todd Blanche. *See United States v. Abrego Garcia*, No. 3:25- cr-115, 2026 WL 1454303, at *3 (M.D. Tenn. May 22, 2026) (finding unrebutted presumed vindictiveness and holding "[t]he reopening of the investigation, Blanche's unrebutted statements, and Singh's sustained oversight together support that inference. Blanche's statements tie Main Justice to the tainted investigation and confirm what motivated it.").

Given this history of initiating political prosecutions, it is unsurprising that DOJ issued unlawful grand jury subpoenas to harass Democratic political leaders in Minnesota.[49] On June 22, 2026, Chief Judge Schiltz quashed these subpoenas, writing:

> Initiating a criminal investigation in order to harass political opponents or to coerce them into taking official action-particularly official action that the federal government cannot directly require those political opponents to take-is a blatantly unlawful and unethical use the grand-jury process. The only question, then, is whether the challenged subpoenas were issued for one of these forbidden purposes. The Court has no doubt that they were.

Order, *In re Grand Jury Subpoenas*, Case No. 26-mc-00043 (PJS), Doc. No. 1 at 15. In quashing the subpoenas, Chief Judge Schiltz emphasized "the Trump administration's

[48] https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump

[49] https://www.nytimes.com/2026/01/29/us/politics/minnesota-justice-department-trump-ice.html

well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries." *Id.* at 17-18.

## IV. IN JANUARY 2026, DOJ BEGAN ITS ATTACK ON THE TRUMP ADMINISTRATION'S POLITICAL OPPONENTS IN MINNESOTA, OF WHICH THIS PROSECUTION IS JUST ONE.

On January 13, 2026, a cadre of experienced and highly-respected federal prosecutors – including the entire management team– resigned *en masse* in protest of the politicization of federal criminal law enforcement in Minnesota.[50] Unfortunately, these resignations – which should have served as a wake-up call to DOJ – did little to slow the decline of a once great U.S. Attorney's office into a political prosecution factory.

In the immediate aftermath of Alex Pretti's murder, DOJ directed federal prosecutors to aggressively charge protesters in Minnesota. According to the New York Times:

> In a conference call in late January, the official, Aakash Singh, laid out the department's basis for prosecuting demonstrators: National Security Presidential Memo 7, a sweeping directive issued by President Trump last September. It expanded the definition of domestic terrorism to include not only violent crimes like assault, but also relatively minor ones, like revealing the personal details of agents or getting in the way of immigration enforcement.
>
> Mr. Singh said that "coordinators" in U.S. attorneys' offices responsible for charging protesters under NSPM-7 should be "hounding" federal agents to make cases, according to people familiar with his remarks. He also suggested that the department wanted headlines along with indictments, promising that officials in Washington would be "blasting out" prosecutors' work.
>
> "Go big," Mr. Singh said, "and go loud."[51]

---

[50] https://www.mprnews.org/story/2026/01/13/us-attorney-on-minnesota-fraud-joe-thompson-resigns-from-office

[51] https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html

On January 28, 2026, DHS and the U.S. Attorney's office put DOJ's direction into action. In one day, DHS both initiated "Operation Puppet Master," a widespread domestic surveillance program directed at ICE protesters, unions and "leftist" organizations, and also conducted the orchestrated self-surrender and doxxing of sixteen individuals charged with assaulting federal officers.[52] The names and photos of these sixteen individuals were disseminated on Pam Bondi's and DHS' X (twitter) accounts, leading to widespread online harassment.

Because these AFO cases had everything to do with public relations, and nothing to do with public safety, they quickly collapsed. Cursory review of the evidence showed that agents had lied and defendants were innocent. The government has voluntarily dismissed eight of the sixteen cases.[53] Others await dismissal. A week after the AFO cases were filed, eight more experienced AUSAs resigned, including the civil chief.[54]

While DOJ was working hard to build political prosecutions in Minnesota, it was simultaneously working to undo the last convictions of January 6 rioters. On the first day of his second term, President Trump commuted the sentences of 14 individuals – the "Oath Keepers" – convicted by a jury of conspiracy for their conduct before and during January

---

[52] https://www.nytimes.com/2026/08/13/us/politics/dhs-inquiry-immigration-protests-minnesota.html?eafs_enabled=false

[53] *U.S. v. Sager*, Case No. 26-mj-69 (MJD/DJF); *U.S. v. Tschida*, Case No. 26-mj-54 (SGE); *U.S. v. Williams*, Case No. 26-mj-70 (SGE); *U.S. v. Adbebe*, Case No. 26-mj-77 (DJF); *U.S. v. Valentine*, Case No. 26-mj-28 (DLM); *U.S. v. Ahmed*, Case No. 26-mj-24 (DLM); *U.S. v. Johnson*, Case No. 26-mj-81 (SGE); *U.S. v. Rank*, Case No. 26-mj-56 (SGE).

[54] https://www.npr.org/2026/02/05/nx-s1-5702356/more-frustrated-prosecutors-at-the-u-s-attorneys-office-in-minnesota-call-it-quits

6. President Trump also granted "a full, complete, and unconditional pardon to all other individuals convicted of offenses related to the events that occurred at or near the United States Capitol on January 6, 2021."[55] Finally, President Trump directed the Attorney General "to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021."[56]

On April 14, 2026, the same day that Vice President Vance was bleating about this prosecution at a Turning Point conference, the government moved to vacate the remaining January 6 convictions then on appeal at the D.C. Circuit Court of Appeals. *See* Unopposed Mot. to Vacate Convictions and to Remand for Dismissal with Prejudice, *Harrelson v. United States*, No. 23-3089 (D.C. Cir.) Doc. 2168665. The Court of Appeals granted that motion, and on May 22, 2026, the government moved to dismiss the indictments from which these convictions derived. District Judge Amit Mehta had no choice but to grant the motion.

In "reluctantly" dismissing these cases, Judge Mehta lamented:

> This is the last of the prosecutions seeking to hold accountable those responsible for the events of January 6. That book is now closed. Today's epilogue diminishes the gravity of that day, denigrates the work of the prosecutors and law enforcement officers who secured these convictions, and excuses criminal acts that caused a centuries-long pillar of our democracy—the peaceful transfer of presidential power—to buckle. The court cannot write a different ending.

---

[55] https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/

[56] *Id.*

Memorandum Opinion and Order, *U.S. v. Elmer S. Rhodes, et al.*, Case No. 22-cr-00015 (APM), Doc. 981 at 15 (D.C. Dist., filed August 4, 2026).

## ARGUMENT

As the above record shows, Defendants' indictment for allegedly assaulting Hernandez was driven by decisionmakers at the highest level of the Department of Justice who, from the outset, painted Defendants as anti-government radicals. The symbiotic relationship between Turning Point and the Trump administration was on full display as this prosecution was initiated with unheard of speed, with public messages bouncing back and forth between Hernandez and administration officials, and joint interviews amplifying their coordinated media messaging. The Trump administration's vested public and political interest in the prosecution of Defendants for their political expression impermissibly infects the prosecutorial process, violates Defendants' due process rights, and merits dismissal of all charges against Defendants. At minimum, Defendants have made the showing necessary to obtain discovery and hold an evidentiary hearing on their vindictive and selective prosecution claims.

### I. THE COURT SHOULD DISMISS THE INDICTMENT FOR SELECTIVE PROSECTION OR ORDER DISCOVERY AND AN EVIDENTIARY HEARING.

#### A. The legal standard.

While the government typically enjoys wide latitude in deciding whom to prosecute, its discretion is not unfettered and remains subject to constitutional constraints. *Wayte v. United States*, 470 U.S. 598, 607-608 (1985). The government's decision to prosecute may not be based on an "unjustifiable standard." *Id*; *United States v. White*, 928 F.3d 734, 742

(8th Cir. 2019) (internal citations omitted). Similarly, a decision to prosecute may not be based on an individual's exercise of her constitutional rights. *Wayte*, 470 U.S. at 608.

The Supreme Court analyzes such claims for selective prosecution by drawing on equal protection principles that proscribe prosecutions animated by discriminatory intent and with discriminatory effect. *See id*. (internal citations omitted). The Eighth Circuit has interpreted this standard to require a selective prosecution claimant to show that the claimant "has been singled out for prosecution while other similarly situated have not been prosecuted for similar conduct and [] that the government's action in thus singling him out was based on an impermissible motive such as race, religion, or the exercise of constitutional rights." *Id.* at 742-743 (quoting *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994)).

Where a defendant's selective prosecution claim hinges on protected political speech, a "defendant may argue he has been selected for prosecution because of his association with a group that is at odds with the government." *United States v. Lazzaro*, No. 21-cv-0173 (PJS/DTS), 2022 WL 17417970, at *4 (D. Minn. Oct. 12, 2022), *R&R adopted*, No. 21-cr-0173 (PJS/DTS), 2022 WL 16948157 (D. Minn. Nov. 15, 2022) (citing to *See United States v. Falk*, 479 F.2d 616, 619-620 (7th Cir. 1973)). In such circumstances, a defendant must "identify others accused of similar crimes who were not members of the group and were not prosecuted." *Id.*

A claim for selective prosecution exists independently of a defendant's guilt—in other words, a claimant may be successful even where she could otherwise be properly prosecuted for the crime charged. *See United States v. Ojala*, 544 F.2d 940, 944 (8th Cir.

1976) ("The question to be resolved is whether the decision to prosecute was made in reprisal for his outspoken opposition to the war, as appellant contends, or whether the decision was made because appellant's offense was flagrant, as the government contends, and so was within nondiscriminatory standards.").

Ultimately, to obtain dismissal on selective prosecution grounds, "a defendant [must] show that: '(1) people similarly situated to [her] were not prosecuted; and (2) the decision to prosecute was motivated by a discriminatory purpose.'" *United States v. Peterson*, 652 F.3d 979, 981 (8th Cir. 2011) (quoting *United States v. Hirsch,* 360 F.3d 860, 864 (8th Cir.2004)). This showing must be made by "clear evidence." *United States v. Hawkins*, No. 24-CR-161 (ECT/DJF), 2024 WL 4972969, at *2 (D. Minn. Dec. 4, 2024) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

A more relaxed standard applies to a defendant's request for discovery and an evidentiary hearing on selective prosecution. Specifically, to obtain discovery and a hearing, a defendant must make "a credible showing of different treatment of similarly situated persons." *United States v. Armstrong*, 517 U.S. 456, 470 (1996). Put differently, "a defendant 'must present some evidence that tends to show the existence of both' discriminatory effect and discriminatory purpose." *Lazarro*, 2022 WL 16948157 at * 2 (quoting *United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998)).

*Armstrong* calibrated these selective prosecution standards, at least in part, based on the "presumption of regularity." *Armstrong* explained, "the presumption of regularity supports [the government's] prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."

*Armstrong*, 517 U.S. at 464 (internal quotation omitted). To dispel this presumption of regularity, a defendant seeking dismissal on a claim of selective prosecution "must present clear evidence to the contrary." *Id.* (internal quotation omitted). Similarly, "the [presumption of regularity]. . . require[s] a correspondingly rigorous standard for discovery in aid of such a claim." *Id*. at 468.

But the Trump administration has squandered the presumption of regularity. Absent that presumption, the showing required for a selective prosecution claim should be lessened. Numerous courts have remarked on the loss of this presumption over the past year, including judges in this District. *E.g., C.R.R. v. Bondi*, 832 F. Supp. 3d 904, 917 (D. Minn. 2026) (expressing doubt about the presumption of regularly typically afforded to the government in prosecutions arising out of Operation Metro Surge); *Minnesota Bureau of Crim. Apprehension v. Noem*, No. 26-cv-628 (ECT/DTS), 2026 WL 266463, at *7 (D. Minn. Feb. 2, 2026) (assuming Plaintiffs rebutted the presumption of regularity that usually attends the actions of public officials in litigation arising out of Operation Metro Surge).[64]

[64] *See also* Evidentiary Hr'g Tr. at 11:8-9, *Abrego Garcia v. Noem*, 8:25-cv-00951, ECF No. 235 (D. Md. July 14, 2025) ("You have taken the presumption of regularity and you've destroyed it in my view."); Order at 2, *Singh v. Tsoukaris*, 1:26-cv-01531 (D.N.J. Feb. 20, 2026), ECF No. 10 ("The presumption of regularity and integrity previously and routinely afforded to the Executive branch and the United States Attorney's Office has been undeniably eroded in this jurisdiction and across the country."); *United States v. Oregon*, --- F. Supp. 3d ----, 2026 WL 318402, at *11 (D. Or. Feb. 5, 2026) ("The presumption of regularity that has been previously extended to [the government] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds."); *United States v. Stewart*, 2025 WL 2754480, at *1 (D.D.C. Sept. 29, 2025) (describing federal prosecutors' conduct as "[a]t a minimum, . . . unseemly; more than likely it is unlawful. Not to mention, this only deepens the growing mistrust of the actions of prosecutors. That is a sentiment that was once unthinkable, but the irregular is now the regular"); Op. and Order at 13, *Chicago Headline Club v. Noem*, 1:25-cv-12173 (N.D. Ill.

Further, the dissipation of the presumption has been marked by widespread resignations and firing of prosecutors throughout the Department of Justice.[65] It is beyond dispute that the presumption is gone. For this reason, *Armstrong*'s standards should be adjusted accordingly. Something less than "clear evidence" should be required for dismissal, and

---

Nov. 20, 2025), ECF No. 281 ("[The government's] widespread misrepresentations call into question everything that Defendants say they are doing."); Mem. & Order, *In re: Administrative Subpoena to Rhode Island Hospital*, 1:26-mc-00007, ECF No. 38 at 1 (D.R.I. May 13, 2026) ("DOJ has proven unworthy of this trust at every point in this case."); *Juan T.R. v. Noem*, 2026 WL 555601, at *2 (D. Minn. Feb. 26, 2026) ("The Court is not aware of another occasion in the history of the United States in which a federal court has had to threaten contempt—again and again and again—to force the *United States government* to comply with court orders.").

[65] *See, e.g.*:

- https://www.thejusticeconnection.org/farewell-messages/
- https://www.nytimes.com/2026/09/25/us/chicago-federal-prosecutor-resigns-broadview-six.html
- https://kstp.com/kstp-news/top-news/star-tribune-8-more-federal-prosecutors-leaving-minnesota-u-s-attorneys-office/
- https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html?eafs_enabled=false
- https://www.americanbar.org/advocacy/governmental_legislative_work/publications/washingtonletter/november-25-wl/outside-the-gao-1125wl/
- https://www.cbsnews.com/news/joe-digenova-resigns-doj-grand-conspiracy-investigation-trump-obama-biden/
- https://www.bostonglobe.com/2026/04/19/nation/fbi-justice-department-scrambling-to-rebuild-after-resignations-firings/
- https://www.cbsnews.com/news/minneapolis-ice-agent-shooting-justice-department-civil-rights-division-resignations/
- https://apnews.com/article/justice-department-bondi-trump-firings-prosecutors-b4134e5db9d9ff7963fc8c4bf7a0a166
- https://www.cnn.com/2026/01/16/us/video/ebof-ex-doj-attorney-resignation
- https://www.axios.com/2025/11/24/doj-resignation-letters-page-trump-administration-firings

something less than "some evidence" should be required for discovery and an evidentiary hearing.

**B. Defendants have presented clear evidence of discriminatory effect.**

Defendants offer clear evidence that their prosecution derives from DOJ's policy and practice of prosecuting so-called "leftists" and those who oppose federal immigration policy. In other words, Defendants have offered credible evidence that that prosecution stems from their association with a "group that is at odds with the government." *United States v. Lazzaro*, WL 17417970, at *4.

Others accused of similar crimes, who are *not* members of the group (here, those *not* opposed to federal immigration policy) were not similarly prosecuted. For example, the government has not prosecuted any federal agent (presumptively a group unopposed to federal immigration policy) for similar alleged acts in this District. This is true even despite substantial evidence demonstrating agents interfering with, even attacking, journalists and others observing and filming immigration enforcement actions and related protests during Operation Metro Surge.[67] Further, the current iteration of DOJ has not only foregone prosecution of right-wing political violence, it has actively sought to undo the last

---

[67] *Incident Database*, U.S. PRESS FREEDOM TRACKER, https://pressfreedomtracker.us/all-incidents/?date_lower=2025-12-01&date_upper=2026-06-01&state=MN*; Attacks on journalists in Minnesota cap Trump's first year back in office*, REPORTERS WITHOUT BORDERS (Jan. 1, 2026) https://rsf.org/en/attacks-journalists-minnesota-cap-trump-s-first-year-back-office; *see also* First Amended Complaint, Doc. 136, *Tincher, et al. v. Mullin, et al.,* Case No. 25-cv-04669 (KMM/DTS) (D. Minn., filed February 13, 2026); Declarations, Docs. 1-1 through 1-13, 33-37, 58-69, 97-99, 102, 106-109, 136-1 through 136-83, 140-144, 146-175, 177-229, 232, 295-296, 298-301, 303-304, 306-307, 309-318, *Tincher, et al. v. Mullin, et al.,* Case No. 25-cv-04669 (KMM/DTS) (describing ICE and CBP misconduct toward legal observers during Operation Metro Surge).

remaining convictions of the January 6 rioters who were convicted of offense conduct far more severe than that alleged here.[68]

**C. Defendants have presented clear evidence of discriminatory purpose.**

The evidence described in this brief shows that the government's decision to prosecute Defendants was motivated by discriminatory animus. In the video previously described from Vice President Vance's speech at a Turning Point rally, Vance specifically frames the decision to prosecute Defendants as a decision to prosecute and defund "those radicals that go around assaulting activists." The Vice President's avowed close decision-making with FBI Director Patel, Assistant Attorney General Dhillon's stated commitment to prosecute, and these officials' public and private communications with Hernandez and "her team" establishes discriminatory animus against the Defendants on the basis of Defendants' opposition to the administration.

*United States v. Falk* is instructive. 479 F.2d 616 (7th Cir. 1973). In *Falk*, an anti-war defendant was charged for refusing to submit to induction in the military and with failure to possess a draft registration card. *Id*. at 617-618. He argued that his prosecution was unconstitutionally selective because he had been prosecuted "not because he had violated the statute but to punish him for and stifle his and others' participation in protected First Amendment activities." *Id*. at 619-620. The Court determined that Falk had made out a *prima facie* case for prosecutorial discrimination because he had presented credible evidence that his punishment, which could otherwise have been valid, stemmed from

[68] *E.g.,* https://apps.npr.org/jan-6-archive/

prosecutorial animus towards his anti-war politics. *Id*. at 623. As indicia of defendant's *prima facie* claim, the *Falk* Court noted that the facts that the defendant was an active and vocal dissenter to United States policy in Vietnam; that the government did not routinely prosecute other violators of the card-carry requirement; and that high-ranking DOJ officials were involved in the decision to prosecute. *Id*.

Like Falk, Defendants are active dissenters opposing United States immigration policy. High-ranking executive branch officials were publicly involved in the decision to prosecute Defendants, and the Trump administration does not routinely (or at all) prosecute persons who have committed similar alleged acts who are *not* actively opposed to federal immigration policy. In short, the evidence of discriminatory animus against them makes their prosecution unconstitutional. As in *Falk*, Defendants have made out a *prima facie* case of selective prosecution by demonstrating that their prosecution was meant to stifle their own and others' First Amendment activity.

**D. The Court should allow Defendants to conduct discovery and hold an evidentiary hearing.**

To obtain discovery on a selective prosecution claim, a defendant must show only "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468-69 (internal quotation marks omitted); *see also United States v. Bass*, 536 U.S. 862, 863 (2002) ("[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent."). As discussed above,

that already relaxed standard must be applied even more flexibly here because the presumption of regularity that undergirds it is gone.

Regardless of whether the Court applies the "some evidence" standard, or a lesser standard, Defendants have presented enough evidence to justify discovery. Defendants have offered credible evidence that the decision to prosecute was framed, from its inception, in terms that derogated the political views of the accused. They have also shown that those who are not members of a group unpopular with the government have not faced similar charges.

## II. THE COURT SHOULD DISMISS ON THE BASIS OF VINDICTIVE PROSECUTION OR ORDER DISCOVERY AND AN EVIDENTIARY HEARING.

### A. The legal standard.

The doctrine of vindictive prosecution "holds that when prosecutors have discretion over charging, they must exercise that discretion legitimately, not as a weapon to punish someone for exercising rights that the Constitution protects. Charges must be 'a legitimate response to perceived criminal conduct,' not 'an impermissible response to noncriminal, protected activity.'" *United States v. Carey*, 816 F. Supp. 3d 129, 139 (D.D.C. 2026) (quoting *United States v. Goodwin*, 457 U.S. 368, 373 (1982)).

A defendant may establish prosecutorial vindictiveness through either of two ways. *United States v. Chappell*, 779 F.3d 872, 879 (8th Cir. 2015). The first is through "objective evidence of the prosecutor's 'vindictive or improper motive' in increasing the number or severity of charges." *Id.* (quoting *United States v. Leathers*, 354 F.3d 955, 961(8th Cir. 2004)). The second is by establishing a "presumption of vindictiveness, if [the Defendant]

provides sufficient evidence to show a reasonable likelihood of vindictiveness exists." *Id*. (internal citations omitted). To determine whether this presumption should apply, the "court must examine the prosecutor's actions in the context of the entire proceedings." *Id*. at 880 (internal citations omitted).

When a defendant establishes that her prosecution is unconstitutionally vindictive, dismissal of the indictment against her is appropriate. Fed. R. Crim. P. 12(b)(3)(A)(iv); *see Bragan v. Poindexter*, 249 F.3d 476, 482 (6th Cir. 2001) (explaining that the appropriate remedy for vindictive prosecution is dismissal or other remedies the court deems appropriate).

To obtain discovery in connection with a motion to dismiss for vindictive prosecution, a defendant must offer "some evidence" of vindictiveness – that "the prosecution was brought in order to punish the defendant for the exercise of a legal right." *United States v. Leathers*, 354 F.3d 955, 961 (8th Cir. 2004); *United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998) (applying the "some evidence" standard from *Armstrong* to vindictive prosecution claim); *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004); *Carey*, 816 F. Supp. 3d at 144 ("Carey must offer some evidence tending to show that he would not have been prosecuted but for his protected speech. Carey easily clears that bar.").

As with *Armstrong*'s application to Defendants' selective prosecution claim, the *Armstrong* standards should be relaxed as to their vindictive prosecution claim because the presumption of regularity by which the *Armstrong* standards were calibrated has been lost. Again, something less than "clear evidence" should be required for dismissal on the basis

of vindictive prosecution here, and something less than “some evidence” should be required for discovery and an evidentiary hearing.

### B. The indictment constitutes an impermissible response to Defendants’ protected First Amendment activity.

Framed from the outset as a political prosecution against “radicals,” this prosecution constitutes an impermissible retaliation against Defendants for their opposition to federal immigration activity. Accordingly, the indictment should be dismissed on the basis of vindictive prosecution. As a threshold issue, Defendants maintain that their alleged actions at the April 11, 2026 protest at the Federal Whipple Building constitute noncriminal, protected activity. While the instant Motion applies equally to each Defendant, the argument for vindictiveness prosecution applies with particular relevance to Paige and Deyanna Ostroushko—against whom the State declined to even press misdemeanor charges for want of evidence. The State’s determination that insufficient evidence existed to justify the criminal charging of Paige and Deyanna underscores the protected and noncriminal nature of Defendants protest activity on April 11, 2026.

### C. Defendants have presented clear evidence of DOJ’s improper motive.

The publicized communications and statements about this case by high-ranking Trump administration officials support a finding of objective intent of improper motive behind Defendants’ prosecution. Vice President Vance characterized Defendants as “radicals” guilty of “assault” at a Turning Point rally just days after the incident and before any charges were brought. These statements by a sitting Vice President, in a case where the most severe allegation is that the alleged victim was shoved, manifest an objective

intent of improper motive in Defendants' prosecution. Stacked on top of Vice President Vance's comments, FBI Director Kash Patel's cozy relationship and personalized communications on social media with Hernandez, Assistant Attorney General Dhillon's similar communications and public statements, and Attorney General Todd Blanche's public celebration of this case and the "message" it sends underscore the objective intent to punish Defendants through severe federal charges and chill anti-ICE protest activity.

**D. Alternatively, sufficient evidence exists to establish a presumption of vindictiveness.**

Alternatively, circumstantial evidence supports a presumption of prosecutorial vindictiveness. The highly skewed and irregular nature of federal prosecutions arising out of Operation Metro Surge is impossible to ignore. The administration's prosecution of Defendants and cozy relationship with Hernandez contrasts sharply with the government's prosecutorial inaction towards federal agents who harassed and assaulted the journalists and legal observers chronicling Operation Metro Surge. The government has not prosecuted – or even investigated - any federal agents on similar charges to those faced by Defendants. In this context, the federal prosecution of Defendants for allegedly assaulting a right-wing journalist supports a presumption of vindictiveness.

In analyzing a claim for vindictive prosecution, the Court "must examine the prosecutor's actions in the context of the entire proceedings." *Chappell*, at 880. (internal citations omitted). Here, that examination yields telling circumstantial evidence that supports a presumption of vindictiveness that infects this prosecution and merits dismissal.

### E. The Court should allow Defendants to conduct discovery and hold an evidentiary hearing.

To obtain discovery or an evidentiary hearing on the issue of vindictive prosecution, a defendant must allege credible evidence in support of her claim. *United States v. Abdi*, No. 23-cr-295 (ECT/DJF), 2024 WL 323577, at *4 (D. Minn. Jan. 29, 2024) (citing *United States v. Kelley*, 152 F.3d 881, 886 (8th Cir. 1998)), *R&R adopted*, No. 23-cr-295 (ECT/DJF), 2024 WL 841312 (D. Minn. Feb. 28, 2024). As discussed above, this standard must be relaxed here because the presumption of regularity no longer applies. Regardless, however, Defendants have pointed to specific evidence—beyond mere allegation or conclusory statement—that casts doubt on the validity of this prosecution and far surpasses the "some evidence" showing *Armstrong* requires.

Among other things, Defendants have offered numerous public statements made by senior Trump administration officials committing to the investigation and prosecution of Defendants within a day of the incident and characterizing Defendants as violent radicals. These public statements – and later public statements celebrating the charges – are more than "some evidence" of vindictiveness sufficient to justify discovery and an evidentiary hearing. *E.g., United States v. Abrego*, 802 F. Supp. 3d 1055, 1060 (M.D. Tenn. 2025) (granting discovery and a hearing and explaining: "Notably, on the day of and shortly after Abrego's arrest, several Executive Official Defendants and their subordinates made public statements about Abrego and celebrated the criminal charges against him."). Discovery and an evidentiary hearing are warranted.

## CONCLUSION

The record supports a finding that Defendants' federal prosecution was animated from the outset by political prerogatives against anti-ICE protest activity. Dismissal or discovery and an evidentiary hearing is the appropriate remedy.

Respectfully submitted,

Dated: September 27, 2026

*/s/ Kevin C. Riach*

Kevin C. Riach (#389277)
**RIACH LAW PLLC**
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Telephone: 612.203.8555
kevin@riachdefense.com
**ATTORNEY FOR DEFENDANT DEYANNA OSTROUSHKO**

*/s/ Thomas H. Shiah*

Thomas H Shiah (#100365)
Law Offices of Thomas H. Shiah, Ltd.
331 Second Avenue South
Suite 705
Minneapolis, MN 55401
612-338-0066
Fax: 612-341-0116
Email: ths@tomshiah.com
**ATTORNEY FOR DEFENDANT CHRISTOPHER OSTROUSHKO**

*/s/ Amy Slusser Conners*

Amy Slusser Conners (#387375)
Best & Flanagan
60 South 6th Street
Suite 2700
Minneapolis, MN 55402
612-339-7121
Email: aconners@bestlaw.com
**ATTORNEY FOR DEFENDANT PAIGE OSTROUSHKO**