UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-86 (NEB/JFD)

UNITED STATES OF AMERICA,

Plaintiff,

v.

(1) CHRISTOPHER JOSIAH OSTROUSHKO,
(2) PAIGE MARIE OSTROUSHKO,
(3) DEYANNA MARIE OSTROUSHKO,

Defendants.

**UNITED STATES' RESPONSE TO DEFEDANTS' MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Nicholas Grey, Special Assistant United States Attorneys, hereby ask the Court to deny the Defendants' Motion to Dismiss for Vindictive and Selective Prosecution. ECF No. 55.

The prosecution in this case falls within the ordinary acceptable discretion granted to the U.S. Attorney. Dismissal nor further discovery on the defendants' motion is supported.

Defendants raise a number of grievances: commutation of sentences for January 6th defendants, alleged abuses by Operation Metro Surge agents, habeas corpus litigation in the District, the prosecution of Abrego Garcia, etc. These other events do not change the fact that on April 11, 2026, the

defendants assaulted the Victim on federal property. Alleged impropriety by other government actors on other cases does not confer immunity to the defendants.

## BACKGROUND

The factual background of this case is set forth more thoroughly in the United States' Response to Motion to Dismiss Count One as Unconstitutional. ECF Doc. 59, responding to ECF Doc. 52.

In the defendants' narrative, this case is deeply embedded in Operation Metro Surge and national political machinations more broadly. Metro Surge does serve as a backdrop. Some 3,000 additional federal agents were temporarily assigned to Minnesota to carry out increased immigration enforcement. By mid-February of 2026 the operation was winding down. Ex. 13.[1] The controversial operation elicited sustained protest and at times violent interactions between protestors and the agents. The U.S. Attorney's Office for the District of Minnesota did bring a number of cases alleging assaults on federal officers.

---

[1] Where possible, the United States shall provide hyperlinks to the publicly available documents which it intends to offer as exhibits for the hearing. Exhibit 13 may be found here: https://apnews.com/article/homan-immigration-agents-minnesota-enforcement-operation-drawdown-5a7940eb9b5100d46efc33a97f524da0

On April 11, 2026, after the conclusion of Metro Surge, the defendants attended an anti-ICE demonstration on federal property outside the Whipple Federal Building on Fort Snelling. The Victim also went to the demonstration in order to record it. A third party identified the Victim as a contributor to the conservative outlet Turning Point USA, which precipitated some members of the crowd to ask the Victim questions and other members of the crowd to hurl insults at the Victim. The crowd turned increasingly hostile against the Victim, with Paige Ostroushko ordering the Victim to leave. The hostilities continued to escalate, with all three defendants physically assaulting the Victim and causing her to flee the federal property where the demonstration was occurring.

Defendants contend that the U.S. has initiated their prosecution on account of their politics. The U.S. Attorney for the District of Minnesota has proceeded with several prosecutions in 2026 that touch upon political matters and many of these prosecutions do not align with defendants' narrative of a prosecution office weaponized against the President's political opponents.

In July 2026 the U.S. obtained two consecutive terms of life plus a consecutive 40-year term for the man that attacked the Democratic party lawmakers Melissa Horman and John Hoffman as well as their spouses. In a press release, Acting Attorney General Todd Blanche stated: "Political violence is an attack not only on its immediate victims, but also on our

communities, our democratic institutions, and the rule of law." U.S. Attorney Daniel Rosen concurred, stating: "Those who commit political violence at any level should take heed that the Department of Justice will seek and obtain the longest prison terms available for their crimes." Ex. 6.[2]

In September 2026 the U.S. Attorney followed through with the language to prosecute "political violence at any level." The U.S. obtained a 14-month sentence against a man that squirted vinegar on U.S. Representative Ilhan Omar during a Town Hall Meeting. In a press release U.S. Attorney Rosen stated: "Political violence is unacceptable. … My office will not tolerate these types of attacks." FBI Minneapolis Field Office Special Agent in Charge Christopher D. Dotson said "[t]he use of any form of violence to assault, resist, or impede officials carrying out their constitutionally appointed duties cannot be tolerated. Today's sentence shows that there are serious consequences for choosing violence over civil discourse." Ex. 7.[3] U.S. Attorney Rosen remarks after sentencing were consistent with those he made at conviction: "This assault is yet another example of a dangerous national trend: people channeling political hatred into criminal acts. The Department of Justice and this U.S. Attorney's Office will not tolerate such behavior." Ex.

---

[2] https://www.justice.gov/usao-mn/pr/vance-boelter-sentenced-two-consecutive-life-terms-plus-40-years-consecutive-stalking

[3] https://www.justice.gov/usao-mn/pr/minnesota-man-sentenced-assaulting-representative-ilhan-omar-during-minneapolis-town

8.[4] The prosecution went forward despite Representative Omar's opposition to the administration's immigration policy, such as her sponsorship of the Make ICE Pay Act. Ex. 9.[5]

In both cases the United States went forward on federal charges despite the availability of state prosecutions. This was true as well for a case brought to trial in April of 2026 where a man was convicted of throwing Molotov Cocktails at a Minneapolis ice cream shop. Ex. 10.[6] The defendant was convicted of an added element of selecting the victim on the basis of actual or perceived gender identity or sexual orientation.

On September 4, 2025, the U.S. Attorney indicted an ICE Agent for false statements made in the context of an investigation related to a shooting during Operation Metro Surge. Ex. 11.[7]

On August 7, 2026, the U.S. obtained a conviction against a Minnesota man for mailing threatening communications and threatening to murder a United States District Judge. In a press release the U.S. Attorney offered similar condemnation of violence: "Those who seek to retaliate against

---

4 https://www.justice.gov/usao-mn/pr/minnesota-man-pleads-guilty-assaulting-us-representative-ilhan-omar-during-minneapolis

5 https://omar.house.gov/media/press-releases/congresswoman-ilhan-omar-introduces-make-ice-pay-act

6 https://www.justice.gov/usao-mn/pr/jury-convicts-arsonist-who-threw-molotov-cocktails-minneapolis-cafe

7 https://www.justice.gov/usao-mn/pr/christian-castro-indicted-grand-jury-making-false-statements

witnesses or judges with threats of violence will be held fully accountable." Ex. 12.[8]

## LEGAL AUTHORITY

The Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws. *Wayte v. United States,* 470 U.S. 598 (1985). Their prosecution authority stems from 28 U.S.C. §§ 516 and 547 as well as the "Take Care" clause of the Constiution. *United States v. Armstrong*, 517 U.S. 456, 465, (1996). There is a presumption of regularity supporting their prosecutorial decision, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties. *Id.* "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978).

Prosecutorial discretion is constrained by the equal protection component of the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497 (1954). The decision to prosecute may not be based on "an unjustifiable standard such as race, religion, or other arbitrary

---

8 https://www.justice.gov/usao-mn/pr/federal-jury-finds-robert-ivers-guilty-all-counts-threats-against-united-states-judge

classification[.]" *Oyler v. Boles,* 368 U.S. 448, 456 (1962). A defendant may demonstrate that the administration of a criminal law is "directed so exclusively against a particular class of persons ... with a mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Armstrong*, 517 U.S. 456, 465 (internal citations and quotation marks omitted).

"The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926). In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Id.*

Courts are "properly hesitant to examine the decision whether to prosecute." *Wayte,* 470 U.S. at 608. Factors such as the strength of the case, a prosecution's general deterrence value, the Government's enforcement priorities, and a case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis that courts are competent to undertake. *Id.* at 607. The courts must also take care not to unnecessarily impair the performance of a core executive constitutional function. "Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and

decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Armstrong*, 517 U.S. at 465, quoting *Wayte*, 470 U.S. at 607-608.

The Eighth Circuit utilizes a two-part test for selective prosecution:

> (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

*United States v. Ojala*, 544 F.2d 940, 943 (8th Cir. 1976).

Historically it has been very difficult for defendants to satisfy these elements, as can be seen by examining two cases, *Ojala* and *United States v. Falk*, 479 F.2d 616 (7th Cir. 1973).

In *Ojala*, a tax delinquency case, the defendant satisfied the first element of intentional discrimination by showing that there were 51,000 similarly situated tax delinquencies in his district and only nine were recommended for criminal prosecution. 544 F.2d at 943. The defendant failed to satisfy the second element of purposeful discrimination. Ojala "a prominent public figure, had announced his purposeful refusal to comply with filing requirements because of his political views…" *Id.* at 944. The Court of Appeals held

"investigation and prosecution because of such an announcement by a public figure falls well within the degree of prosecutorial discretion which is historically a part of our criminal justice system." *Id.* "It is not surprising that the government might prosecute those cases in which the violations of the tax laws appeared most flagrant." *Id.* at 924.

In *Falk* the Seventh Circuit Court of Appeals held the defendant should have been afforded a hearing to develop a claim of selective prosecution for failure to possess a draft card where the defendant had proffered that 25,000 Selective Service registrants had dispossessed themselves of their draft cards without criminal sanction. 479 F.2d at 621. Falk was "actively involved in advising others on methods of legally avoiding military service and in protesting American actions in Vietnam." *Id.* at 621. A policy memo from the Director of the Selective Service System stated "it would seem that when a registrant is willing to be inducted, he should not be prosecuted for minor offenses committed during his processing." *Id.* at 622. After a three-year delay it appeared Falk "was indicted and prosecuted for violation of the card possession requirements only because he [later] exercised his First Amendment privilege to claim a statutory right as a conscientious objector." *Id.* at 623.

## ARGUMENT

## I. The Presumption of Regularity is present and must be rebutted.

The defendants cite a number of lower court decisions where the presumption of regularity was arguably rebutted. To rebut the presumption of regularity in the context of specific cases, however, does not eliminate the presumption of regularity in other cases. Presumptions are rebutted on a case-by-case basis without eliminating or weakening the presumption (e.g. the presumption of innocence is overcome in an individual case but remains intact in all other cases). There is no appellate case law to suggest that the presumption of regularity has been eliminated or modified. The defendants must rebut the presumption of regularity *in this case*.

## II. Defendants have not demonstrated that they were singled out for prosecution.

The defendants in this case fail to establish the first element of intentional discrimination. They have not demonstrated or alleged there to be tens of thousands of similarly situated offenders which the United States has not prosecuted. Nor is it plausible that defendants will produce such evidence. The offenses in *Ojala* (non-compliance with tax filing) and *Falk* (non-possession of a draft card during the Vietnam War) were very common at the time and the rare prosecutions were noteworthy. The offenses of battery on

federal property and depriving a person of the use of federal facilities are thankfully rare. Prosecutions for these offenses are rare due to the rarity of the offenses, not due to highly selective prosecution.

Defendants have not demonstrated that others similarly situated have not generally been prosecuted. To establish this element "the defendant must identify others accused of similar crimes who were not members of the group and were not prosecuted." *United States v. Lazzaro*, No. 21-CV-0173 (PJS/DTS), 2022 WL 17417970, at *4 (D. Minn. Oct. 12, 2022), report and recommendation adopted, (D. Minn. Nov. 15, 2022) citing *United States v. Falk*, 479 F.2d 616, 619-620 (7th Cir. 1973). The defendants offer two possible comparables: January 6 Capitol riot defendants and federal officers involved with Operation Metro Surge. Neither comparable is sufficient.

Similarly situated defendants (the comparables) must be narrowly defined. "Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decisionmakers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *United States v. Bass*, 536 U.S. 862 (2002)(italics original).

The Capitol riot defendants are not a valid comparable. The Capitol riot convictions relate to a single day and place, i.e. January 6, 2021, at the U.S.

Capitol. The DOJ's actions on those cases do not signal a policy in the District of Minnesota to engage in politics-based prosecutions in 2026.

The defendants offer the officers of Operation Metro Surge as another comparable group. The defendants contend the "government has not prosecuted any federal agent (presumptively a group unopposed to federal immigration policy) for similar alleged acts in this District." Mot. 25.

The defendants' evidence of agents interfering with and attacking journalists is so far limited to an unresolved lawsuits and two websites. Mot. n. 67. The rule against hearsay requires that the offerors of such evidence testify in this matter before the Court can consider their allegations. The civil suit declarations may be admissible for purposes of deciding a preliminary injunction in a civil suit, but FRE 802 applies to this motion.

Even accepting for argument's sake that federal agents have committed offenses, the defendants have not shown that non-prosecution decisions were based on the agents' political leanings. The comparison fails for a number of reasons.

First, the "similar alleged acts" have major legal distinctions. The defendants are charged with crimes that would be inapplicable to the alleged misconduct of the Metro Surge agents. The battery statute in this case (18 U.S.C. § 113) has a specific geographical element (i.e. federal property) that would not be applicable to most of the Twin Cities metro region where Metro

Surge agents operated. Count One (violation of 18 U.S.C. § 245) also has a federal jurisdictional requirement that would not be present in the allegations against the Metro Surge agents. The U.S. intends to show that the defendants violated 18 U.S.C. § 245 by denying the victim the use of a federal facility by harassing her and assaulting her. The undersigned is not aware of cases where agents are alleged to have unlawfully denied citizens the use of federal facilities.

Second, the United States is permitted to consider a case's difficulty when deciding whether to proceed, and battery cases against officers arising out of the course of their duties are often more complicated than battery cases against non-officers. This is because an officer will often have lawful authority to initiate force, such as making an arrest or enforcing a perimeter. These create murky situations, such as where officers are attempting to arrest one individual and are confronted by a mixture of other individuals: some unlawfully attempting to "de-arrest" the first individual, some entering a lawful perimeter against the officer's orders, and some ambiguously at the edge of the perimeter. Scenarios such as this require a nuanced consideration of the appropriate use of force. Additionally, individuals are generally not considered to have a right to violently oppose an officer's arrest, as they might otherwise have against a non-officer. Combine this with the mistake-of-fact defense and it can be very difficult to prove beyond a reasonable doubt that an officer's on-

the-job use of force amounts to a criminal battery, particularly where the events can only be established by conflicting testimony.

By contrast, a typical case against a civilian defendant may require showing a simple violation of a bright-line rule against initiating force. In this case, it is abundantly clear that the Victim had a right to be present at Fort Snelling and that the defendants had no right to order her away from the public street and sidewalk. There may be some legal question as to the degree to which the Victim was entitled to use force for her defense and the degree of force with which the defendants could respond. The scope of this disagreement will relatively contained, however, as the relevant events were recorded from multiple angles.

Nor should the Court uncritically accept the defendants' assertion that "the Trump administration does not routinely (or at all) prosecute persons who have committed similar alleged acts who are *not* actively opposed to federal immigration policy." Def. Mot. 27. A defendant's stance on immigration is generally unknown and it is seemingly impossible to compile statistics about the percentage of defendants that agree with the administration's policy versus the percentage of defendants that disagree with the administration's policy. The United States awaits defendants' competent and admissible data on this issue.

While widespread data does not exist, the United States can direct the Court to the case of assault against Representative Ilhan Omar discussed in the background section above. Moments prior to the assault, Representative Omar "called for the then-Department of Homeland Security (DHS) Secretary [Kristi Noem] to resign. The defendant, seated in the front row of the audience, suddenly stood up and aggressively approached Representative Omar in the front of the room and sprayed her with liquid from a syringe, shouting, 'She's not resigning. You're splitting Minnesotans apart.'" Ex. 7. The U.S. obtained a 14-month sentence against the defendant for spraying a syringe of vinegar on the Representative, despite the defendant's vocal support for the DHS Secretary.

## III. Defendants' have not demonstrated an impermissible motive for selecting them for prosecution

The defendants in this case also fail to establish the second element of purposeful discrimination. The United States' consideration of the offense's publicity is not impermissible. *Ojala* favorably cited to Seventh Circuit holdings that "political prominence is not an impermissible consideration in the selection process" noting "[i]t makes good sense to prosecute those who will receive the media's attention" due to the potential to enhance the deterrent effect of the prosecution. 544 F.2d at 944, citing *United States v. Peskin*, 527

F.2d 71, 86 (7th Cir. 1975). "It is not surprising that the government might prosecute those cases in which the violations of the tax laws appeared most flagrant." *Ojala*, 544 F.2d at 945.

In this case the defendants flagrantly assaulted the victim and drove her from federal property where she had an equal right to remain. The events occurred in public in front of dozens of witnesses and were recorded and widely disseminated. Such brazen lawbreaking merits prosecution.

The defendants infer some impropriety in the District's U.S. Attorney's Office based on several resignations, citing an MPR article. Def. Mot. n. 50. They offer no direct evidence of the AUSAs motivation. The news article is itself hearsay, and it does not even purport to be quoting the AUSAs. More directly, the resignations took place prior to the offenses on April 11, 2026, so they cannot be seen as direct objection to this case.

The defendants note that the "government secured an indictment at light speed…" Def. Mot. 14. This seems to intimate that rapidity of prosecution is somehow suggestive of permissive motive. By comparison, the complaint against Representative Omar's attacker was brought within one day. Ex. 7. By contrast, the court in *Falk* considered a three-year delay in that case to be suggestive of improper motive. Speed and lack of speed cannot both be indictive of improper motive.

It is not necessary to infer and speculate as to the U.S. Attorney's motivation for bringing the case. He has put forward a plausible explanation in the press release when announcing the indictment: "Political violence is a national scourge, and federal law enforcement will not tolerate it." Ex. 14.[9] This language is consistent with what he has used in other cases where democrats were victims. *See e.g.* Ex. 6 ("Those who commit political violence at any level should take heed that the Department of Justice will seek and obtain the longest prison terms available for their crimes") and Ex. 7 ("Political violence is unacceptable…My office will not tolerate these types of attacks.")

## IV. Defendants point to no cases in which assault on an individual were dismissed due to selective or vindictive prosecution.

In *Falk* and *Ojala,* discussed above, the crimes at issue were essentially victimless. *Ojala* involved non-compliance with tax filing and *Falk* involved non-possession of a draft card. Defendants point to no case where assault charges were dismissed for vindictive or selective prosecution.

This is likely because assault cases rest squarely in the category of ordinary cases. "In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the

---

9 https://www.justice.gov/usao-mn/pr/three-individuals-federally-charged-assault-and-intimidating-turning-point-usa

decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation and quotation marks omitted). The Due Process Clause prohibits "the administration of a criminal law [that] is directed so exclusively against a particular class of persons with a mind so unequal and oppressive that the system of prosecution amounts to a practical denial of equal protection of the law." *Id* 464-465 (citations and quotation marks omitted).

It is easy to see the potential denial of equal protection of the law in *Falk* and *Ojala*. The crimes at issue were essentially victimless. There were tens of thousands of others that were not being prosecuted for similar crimes. With so few charged with such minor offenses, it begs the question why the prosecutor selected the individual defendants.

The defendants' motion extensively discusses the political support that Turning Point USA (TPUSA) provides to the President and his party. The motion notes that the victim is employed and affiliated with TPUSA. The victim's connections might imply that she is under some form of special protection. Intensive fact finding about the victim's relationship with the administration is not required, however, as the case law on vindictive and selective prosecution focuses solely on defendants and not victims. The defendants do not cite any cases in which a court expressed concern that a

prosecution was improperly motivated due to the status of the victim. The undersigned has not encountered any cases where dismissal was even a consideration on account of the victim being well-connected.

## V. Further Discovery and Evidentiary Hearing Are Not Required

As an alternative to dismissal the defendants' request discovery and further hearing to develop their request for dismissal.

"[A] defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent." *Bass*, 536 U.S. at 863.

*Armstrong* teaches that the evidence must be admissible and on point, and might more fairly be called a "credible showing" than merely "some evidence." 517 U.S. at 470. The defendants in that case were charged with conspiring to possess crack. *Id.* 458. They argued they were singled out for prosecution because they were black. *Id.* As evidence to support their claim they offered an affidavit from a paralegal specialist with the Federal Public Defender stating that "in every one of the 24 § 841 or § 846 cases closed by the office during 1991, the defendant was black." *Id.* Accompanying the affidavit was a "study" listing the 24 defendants, their race, whether they were prosecuted for dealing cocaine as well as crack, and the status of each case. *Id.*

The *Armstrong* defendants later offered "an affidavit from a criminal defense attorney alleging that in his experience many nonblacks are prosecuted in state court for crack offenses" and "a newspaper article reporting that federal crack criminals are being punished far more severely than if they had been caught with powder cocaine, and almost every single one of them is black." *Id.* at 460 (internal quotation and citation omitted).

The Supreme Court did not consider this to be "some evidence" of the essential elements, and its discussion eliminated each piece, one by one. "The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.* at 470. "The newspaper article, which discussed the discriminatory effect of federal drug sentencing laws, was not relevant to an allegation of discrimination in decisions to prosecute." *Id.* "Respondents' affidavits, which recounted one attorney's conversation with a drug treatment center employee and the experience of another attorney defending drug prosecutions in state court, recounted hearsay and reported personal conclusions based on anecdotal evidence." *Id.*

Ultimately the *Armstrong* defendants failed to obtain dismissal or even further discovery. The Court was unsympathetic to a claim that discovery was needed to further develop the motion.

> In the present case, if the claim of selective prosecution were well founded, it should not have been an insuperable task to prove that persons of other races were being treated differently than respondents. For instance, respondents could have investigated whether similarly situated persons of other races were prosecuted by the State of California and were known to federal law enforcement officers, but were not prosecuted in federal court. We think the required threshold—a credible showing of different treatment of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.

*Id.*

The defendants in this case likewise have not met "the required threshold—a credible showing of different treatment of similarly situated persons…" They have provided no data of whether similarly situated persons of other political affiliations were prosecuted by the State of Minnesota, known to federal law enforcement, but not prosecuted in federal court. They have provided no data more broadly of the numbers of 18 U.S.C. §§ 113 and 245 offenses that occur in the District, or which share of these are committed by those without the defendants' political affiliations. As in *Armstrong,* they have offered "recounted hearsay" and "anecdotal evidence."

Moreover, the defendants' motion does not articulate what discovery they seek. It is unclear if they expect the United States to perform a data dive on prosecution statistics (an investigation the *Armstrong* Court placed upon

defendants). Alternatively, perhaps, they seek testimony of the U.S. Attorney, FBI Director, or Vice President. Without knowing what specific discovery the defendants are seeking the United States is unable to respond with particularity (e.g. executive privilege, attorney-client privilege, etc.). If the Court is inclined to grant discovery the U.S. requests additional briefing to address specific discovery requests once made.

## CONCLUSION

Ironically, the defendants present such a high bar to prosecution that it would create the biased system of justice the defendants fear. The defendants argue that their politics differ from the current administration, therefore the administration cannot be trusted to prosecute them. Their politics essentially becomes a shield to prosecution. The defendants' argument does not appear to have a limiting principle. Anyone in public opposition to the administration's immigration policies would seemingly be able to avail themselves of the defense. By the defendants' rationale, the United States would only be able to prosecute people that are in favor of the administration's policies (or possibly those that are neutral or publicly uncommitted). The United States has prosecuted those who attacked Democratic state law makers and a Democratic U.S. Representative. The U.S. prosecuted a man who threatened judges and is prosecuting an ICE Agents for false statements. But the U.S. is unable to defend a victim of assault because she works for TPUSA?

The United States can lawfully prosecute § 113 and § 245 offenses without regard to a defendant's politics. The U.S. requests the Court to deny the defendants' motion and allow the prosecution to proceed.

Dated: October 20, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*s/ Nicholas R. Grey*
BY: NICHOLAS R. GREY
Special Assistant U.S. Attorney
Attorney ID No. 283780CA